J-S10031-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.R.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1649 MDA 2025 |

Appeal from the Decree Entered October 24, 2025
In the Court of Common Pleas of Lebanon County
Orphans' Court at No. OC-25-0072

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: APRIL 20, 2026**

N.R.D. (Father) appeals from the decree which granted the petition of Lebanon County Children and Youth Services (CYS) and terminated his parental rights to P.R.D. (Child).[1]  After careful review, we vacate the decree and remand to the orphans' court with instructions.

Case History

Child was born in March 2024.  CYS became involved with the family because Mother and Child tested positive for cocaine at the time of Child's birth.  The orphans' court explained:

> Mother informed [CYS] that she would like Child to be adopted. Father was not present at the hospital at the time of Child's birth and [CYS] could not reach him.  [CYS] looked into potential kinship resources including the paternal grandfather and paternal

---

[1] The orphans' court also terminated the parental rights of Child's mother, A.M.R. (Mother).  It does not appear that Mother has filed an appeal.

grandmother. However, paternal grandmother was already caring for Mother's five (5) other children and stated she was unable to care for a newborn at the time. Paternal grandfather was also not willing to care for Child. [CYS] was granted verbal emergency custody of Child on March 6, 2024. Eventually [CYS] was able to get in contact with Father after placement occurred. However, Father tested positive for cocaine at that time.

Upon discharge from the hospital, Child was placed in a foster home on March 7, 2024. On March 8, 2024, [CYS] filed an Application for Emergency Protective Custody. Following a shelter care hearing held on March 11, 2024, [CYS] was granted continued legal and physical custody of Child. Also on March 8, 2024, [CYS] filed a Dependency Petition alleging that Child was without proper parental care and control…. Following a [d]ependency [h]earing on October 28, 2024, the [c]ourt found Child dependent…. Child has remained in the same [CYS] approved foster home since placement on March 7, 2024.

Neither Mother nor Father have completed their goals outlined in the Child Permanency Plan dated May 19, 2025. …

Permanency Review Hearings were held on October 28, 2024, and April 16, 2025. At these hearings, the [c]ourt found that compliance with the Child Permanency Plan and progress towards alleviating the circumstances that necessitated placement was inconsistent. … Father had minimal compliance with the Permanency Plan and progress towards alleviating the circumstances that necessitated the original placement at the time of the first [h]earing. [A]t the time of the hearing on April 16, 2025, Father had no compliance with the Permanency Plan and no progress towards alleviating the circumstances that necessitated the original placement.

Orphans' Court Opinion (OCO), 12/17/25, at 4-5 (citations omitted).[2]

From the inception of the case, the dependency court had directed

Father to complete a drug and alcohol evaluation and follow recommended

treatment, establish stable housing and employment, and attend supervised

---

[2] The OCO was filed on December 17, 2025, but is incorrectly dated June 19, 2024. **See** OCO at 2.

visits with Child. Father did not comply with these directives. Thus, on June 10, 2025, CYS petitioned to terminate Father's parental rights.

The orphans' court held a termination hearing on October 24, 2025.[3] CYS presented testimony from their caseworker supervisor, Payge Hess, and Father testified in opposition to termination.

*Ms. Hess*

Ms. Hess testified that Father had not remedied the conditions which caused Child to come into CYS's care and failed to maintain communication with CYS. Ms. Hess said that CYS "would reach out" with "phone calls, texts, emails; and we wouldn't get much response." N.T. at 15. In Ms. Hess's view, Father's lack of communication "made it very difficult to really engage [Father] with the different services" CYS offered. *Id.* at 22.

Ms. Hess testified that although Father completed a drug and alcohol evaluation, he "did not agree with the recommendations." *Id.* at 17. She explained that Father was "recommended for rehab" at an inpatient facility, but "he declined that." *Id.* at 28. Also, as a result of Father's poor communication, CYS did not know where Father lived, and Father had failed to establish stable housing and employment. *Id.* at 16-17. Finally, Ms. Hess testified that Father had not visited Child for over a year, "since June of 2024."

_____

[3] Although Child was approximately 20 months old at the time, separate counsel appeared on behalf of Child's best and legal interests. *See* N.T., 10/24/25, at 4-5. At the close of the hearing, Child's legal counsel stated that she "would normally be asking what the child [wants to] represent," but "here the child is too young to speak." *Id.* at 89-90.

*Id.* at 16. Ms. Hess stated that Father failed to meet Child's needs because "he simply hasn't been there to provide those things that [C]hild needs." *Id.* at 20. Ms. Hess added, "I don't believe [Child] knows" Father. *Id.* at 22.

Regarding Child's placement, Ms. Hess testified that Child had lived with the foster parents continuously for 20 months. *Id.* at 17-18. Ms. Hess confirmed that the foster parents were an adoptive resource. *Id.* at 33. She relayed that Child is the only child in the home, and "doing really well." *Id.* at 18, 21. She also described Child and the foster parents as "extremely bonded." *Id.* at 20. Ms. Hess stated:

> They do everything together. [The foster parents] are very patient and very cautious. If they see any little thing wrong, they're immediately trying to make sure that [Child is] okay and she's meeting all milestones. They very much prioritize [Child] and make sure she's fully healthy.
>
> ***
>
> [Foster parents] go on walks [with Child]. They'll go to the park and go on swings. They go visit any type of museum that would be interesting to [Child]. They are very involved with [Child].
>
> ***
>
> [T]hey are just actively there with her. Anytime there is discomfort or she's upset, they're there to support her and give her reassurance. [T]heir entire world [revolves] around [Child].

*Id.* at 20-21. When CYS's counsel asked Ms. Hess whether "there would be a severe impact" on Child if Father's rights were terminated, Ms. Hess answered "[n]o." *Id.* at 23.

- 4 -

*Father*

Father testified that he had been employed "full time at Wendy's" for "[a]lmost two years." *Id.* at 41. He stated that he was working when Child was born, and that he contacted CYS after Child was placed in foster care. *Id.* at 43. Father claimed he and Mother previously "had our own place" which CYS visited and approved, but at the time of the hearing, Father testified he was not living with Mother and "staying at a friend's house" while waiting to move into an apartment. *Id.* at 45-46. Father stated that he had space for Child "where I'm currently at." *Id.* at 59. However, when the orphans' court asked Father for his address, Father replied: "I don't know the address off the top of my head." *Id.* at 60.

With respect to his drug and alcohol evaluation, Father testified that CYS "couldn't even show me test results" and "[a]ll they said is that they received a referral." *Id.* at 50. Father denied being referred to inpatient rehab, and stated that the recommendation was for treatment, "once a week, if I wanted to go to counseling." *Id.*

As to Child, Father conceded that he had not visited Child since June 2024. *Id.* at 48. Father stated, "a couple of times where we have meetings set up … I [went] and they're like, the meeting was an hour ago. … So I come … all the way here … for no reason because I missed the appointment for the time that we set." *Id.* Father testified that "we would set appointments up[,] and the times would get changed." *Id.* at 49.

Father acknowledged he had received copies of all but the most recent Child Permanency Plan. *Id.* at 54. When Father's counsel asked Father whether he was aware of his goals, Father stated, "Yeah, I got the goals." *Id.* Father also testified that he did not "contact [CYS] because they do not acknowledge me at all." *Id.* at 76.

*Guardian ad litem (GAL)*

The GAL advocated for termination of Father's parental rights. The GAL stated that Child "is thriving" and "well bonded with the foster parents." *Id.* at 90. To the contrary, the GAL testified that Child had "no bond" with Father. *Id.* at 92.

At the conclusion of the hearing, the orphans' court announced its decision to terminate Father's parental rights. The court noted "it's been a year and four months since [Father] has had contact" with Child, and "[t]hings are just not where I'd like them to be." *Id.* at 94. The court stated its "find[ing] that Sections 1 and 2, 5 and 8, of Section 2511 [of the Adoption Act] have been satisfied; and therefore, I'm going to enter this Order." *Id.* at 96. On October 24, 2025, the orphans' court issued the decree terminating Father's parental rights. Father timely appealed and filed a concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father presents the following questions for review:

1. Did the Trial Court err in granting the Petition for Involuntary Termination of Parental Rights where Lebanon County Children and Youth Services failed to meet its burden pursuant to 23 Pa.C.S. § 2511(a)(1)?

- 6 -

2. Did the Trial Court err in granting the Petition for Involuntary Termination of Parental Rights where Lebanon County Children and Youth Services failed to meet its burden pursuant to 23 Pa.C.S. § 2511(a)(2)?

3. Did the Trial Court err in granting the Petition for Involuntary Termination of Parental Rights where Lebanon County Children and Youth Services failed to meet its burden pursuant to 23 Pa.C.S. § 2511(a)(5)?

4. Did the Trial Court err in granting the Petition for Involuntary Termination of Parental Rights where Lebanon County Children and Youth Services failed to meet its burden pursuant to 23 Pa.C.S. § 2511(a)(8)?

5. Did the Trial Court err in granting the Petition for Involuntary Termination of Parental Rights without properly considering the bond that exists between [C]hild and [Father]?

6. Did the Trial Court err in granting the Petition for Involuntary Termination of Parental Rights without properly considering the bond that exists between [C]hild and [C]hild's siblings?

Father's Brief at 8-9.

Discussion

This Court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. ***Interest of S.K.L.R.***, 256 A.3d 1108, 1123 (Pa. 2021). Where the factual findings are supported by the evidence, we may not disturb the ruling unless we discern an error of law or abuse of discretion. ***In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021). Our Supreme Court has explained:

Because [orphans'] courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing [the] courts' decisions in this arena, appellate courts defer to [the] courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of

law, and appellate courts may reverse [orphans'] courts only when that discretion has been breached or when the law has been misapplied. In other words, an appellate court should review the certified record to decide whether it supports the [orphans'] court's order, regardless of whether the appellate court agrees with the result that the [orphans'] court reached.

***Interest of S.K.L.R.***, 256 A.3d at 1129.

Initially, the orphans' court must consider a parent's conduct and the grounds for termination enumerated in the Adoption Act at 23 Pa.C.S. § 2511(a). If the court finds clear and convincing grounds for termination under Section 2511(a), it must then assess the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). This Court "need only agree with [the orphans' court's] decision as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), which state:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or

mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. …

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. …

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child. …

23 Pa.C.S. § 2511(a).

Our review reveals support for termination of Father's parental rights under Section 2511(a)(1), where Father refused or failed to perform parental duties for a period in excess of six months prior to CYS filing the termination petition. CYS filed the petition to terminate Father's parental rights on June 10, 2025. Ms. Hess testified that throughout Child's dependency, Father "simply hasn't been there to provide" for Child. *Id.* at 20. Father admitted he had not visited Child since June 2024, and confirmed that he failed to maintain contact with CYS. *Id.* at 76. As the orphans' court observed:

> Regarding grounds pursuant to 23 Pa.C.S. § 2511(a)(1) … Father … demonstrated a refusal or failure to perform parental duties because [he] failed to complete the required goals in the nearly twenty-one (21) months [C]hild has been in care. Child has been in foster care for one year and seven months at the time of the

termination hearing and has never been in the care of [Father]. The [c]ourt emphasizes that Child was placed into a foster home immediately after discharge from the hospital after birth and has remained in the same foster home since that time. Additionally, [Father's] level of cooperation and progress was never consistent throughout the case and conditions that led to the removal and placement of Child continue to exist. [Father] resisted making any real progress in [his] goals and instead deflected blame on [CYS]'s bias against [him].

OCO at 11.

The record supports the orphans' court's findings of grounds for termination under Section 2511(a)(1). Therefore, the orphans' court need not revisit grounds for termination on remand, which is necessitated by the following discussion about the orphans' court's failure to adequately determine, pursuant to Section 2511(b), whether termination would best serve Child's needs and welfare.

To support the termination of parental rights, an orphans' court "must conduct a full subsection [2511](b) analysis focused on the child." *Int. of K.T.*, 296 A.3d 1085, 1114 (Pa. 2023). Section 2511(b) requires that the orphans' court give primary consideration to a child's needs and welfare. 23 Pa.C.S. § 2511(b). Intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The orphans' court must consider any parent-child bond and the effect on the child of severing the bond. *Id.* "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *Int. of K.T.*, 296 A.3d at

1105.  The analysis must be made on a case-by-case basis, with the court considering each child's special needs.  *Id.* at 1105-1106.  The Pennsylvania Supreme Court has explained:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and [the federal Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.  These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs.  *See T.S.M.*, 71 A.3d at 268–69 ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.").

*Id.* at 1113.  Orphans' courts "have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs."  *Id.*

Here, the orphans' court failed to determine, pursuant to Section 2511(b), whether CYS presented clear and convincing evidence that termination of Father's parental rights would best serve Child's needs and welfare.  The orphans' court did not mention Section 2511(b) when it announced its decision on the record.  The orphans' court also fails to mention Section 2511(b) in its opinion, although it implies that termination is in Child's best interests based on Ms. Hess's testimony that "Child does not know who" Father is, and in contrast, is bonded with the foster parents, who have

- 11 -

"continued to provide Child with stability and support." *See* OCO at 12. Without further explanation, the orphans' court concludes that termination of Father's parental rights best serves Child's needs and welfare "because adoption by her respective foster parents will provide him [*sic*] stability and permanency in a setting where his [*sic*] needs are met and he [*sic*] is thriving." *Id.* at 13.

As the orphans' court has not provided an analysis of Child's needs and welfare pursuant to Section 2511(b), we vacate the decree and remand the case for the orphans' court to conduct the requisite Section 2511(b) needs and welfare analysis within 21 days of receiving the certified record. *See K.T.*, 296 A.3d at 1114 (Supreme Court remanding case where the "trial court here did not explain the subsection (b) considerations of foster parent bond, preadoptive home, and need for permanency – it made no reference to them at all in its discussion, despite the fact the record included relevant evidence."). The orphans' court shall not reopen the record or hear additional evidence, and shall make its determination regarding Child's needs and welfare based on the evidence presented at the October 24, 2025 hearing.

Decree vacated. Case remanded with instructions to the trial court to act within 21 days of receipt of the certified record, which we direct the Prothonotary to remit immediately. Jurisdiction retained.